David J. FINE, as he is Receiver of Bradford C. Bleidt and Allocation Plus Asset Management Co., et al., Plaintiffs,

v.

SOVEREIGN BANK, Defendant.

Civil Action No. 06cv11450–NG.

United States District Court, D. Massachusetts.

Nov. 27, 2009.

David J. Fine, Law Offices of David J. Fine, Boston, MA, pro se.

Melanie L. Oxhorn, New York, NY, Sylvia Katsenes, Newton, MA, for Plaintiffs.

Patrick T. Voke, Daniel J. Blake, LeClair Ryan, P.C., Michele T. Perillo, U.S. Securities & Exchange Commission, Boston, MA, for Defendant.

### ORDER ON PLAINTIFFS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, A NEW TRIAL

GERTNER, District Judge:

Over some twenty years, Bradford Bleidt ("Bleidt") swindled his clients out of tens of millions of dollars. This litigation arises from the aftermath of the fraud. The receiver for Bleidt's wholly owned company and his former clients sued defendant Sovereign Bank ("defendant" or "Sovereign"), alleging that it is in part responsible for the fraud.

The lawsuit began on August 17, 2006. Joining the receiver as plaintiffs were four particular investor-clients: Nancy and Langdon F. Lombard ("the Lombards"), Donna Brandt Lawrence, and Bessie Panos ("Panos").[1] After a trial in December 2008, the jury returned a verdict in favor of Sovereign on all of the plaintiffs' claims. All plaintiffs moved for a new trial; the Lombards and Panos also moved for judgment as a matter of law on their conversion claims.

On September 5, 2009, the Court denied plaintiffs' motions for a new trial (document # 400, 447) and reserved plaintiffs' timely filed motions for judgment as a matter of law (document # 397, 446). Upon further consideration, the Court concludes that the Lombards and Panos are not entitled to judgment as a matter of law because they have not met Federal Rule of Civil Procedure 50(b)'s strict standard. At the same time, the Court reconsiders its previous denial of plaintiffs' motion for new trial, which is governed by a different standard set forth in Federal Rule of Civil Procedure 59. The Court now grants that motion for a new trial (document # 400, 447), but only insofar as it requests a new trial on the Lombards' and Panos' conversion claims. The Court's September 5, 2009, decision with respect to the other grounds set forth in plaintiffs' motion stands; the renewed motions for judgment as a matter of law (document # 397, 446) are denied.

---

1. In addition to the initial plaintiffs, a number of other investors have moved to intervene.

The new trial that the Court orders today will be consolidated with the trial of the intervenors' claims. *See* Compl. in Intervention, *Fine v. Sovereign Bank,* No. 06cv11450–NG (D. Mass. filed Feb. 23, 2009).

## I. BACKGROUND

### A. Facts

#### 1. Bleidt's Fraud Generally and the Ensuing Litigation

Bradford Bleidt operated Allocation Plus Asset Management Company, Inc. ("APAM"), an investment advisory firm of which he was the sole shareholder and sole director. Trial Tr. 46–47, 75, Dec. 11, 2008. Bleidt convinced APAM's investor-clients to give him money under the false pretense that he would invest it on their behalf. Rather than investing the money, he misappropriated it. *See id.* at 76.

Inevitably, Bleidt's Ponzi scheme unraveled, and on or about November 11, 2004, he mailed audiotapes to his wife, colleagues, and the SEC confessing his crimes. On November 12, 2004, the SEC initiated an emergency action in this Court to prevent Bleidt and APAM from further dissipating any assets belonging to the investor-clients. *See* Compl., *SEC v. Bleidt,* No. 04cv12415–NG (D. Mass. filed Nov. 12, 2004). Bleidt, APAM, and the SEC eventually reached an agreed-upon judgment, in which Bleidt and APAM promised to "pay, jointly and severally ..., disgorgement of $31,734,192.75, representing profits gained as a result of the [Ponzi scheme] ..., together with prejudgment interest thereon in the amount of $9,497,553.30, for a total of $41,231,746.05." Final J. as to Def. APAM, *SEC v. Bleidt,* No. 04cv12415–

NG (D.Mass. May 3, 2007). Bleidt was also charged with 115 counts of mail fraud and one count of money laundering. He pleaded guilty to all counts and was sentenced to 135 months' imprisonment. J. in a Criminal Case, *United States v. Bleidt,* No. 05cr10144–WGY (D.Mass. Dec. 7, 2005). He was also ordered to pay the same $31,734,192.75 in restitution as part of the criminal judgment. *Id.* at 5.

As part of the effort to preserve and maximize assets to be repaid to the investor-clients, the Court appointed David A. Vicinanzo ("Vicinanzo") as receiver for APAM. Due to a potential conflict of interest,[2] the Court also appointed David J. Fine ("the receiver") as an ancillary receiver "in matters related to claims or potential claims against banks." Order for Appointment of Ancillary Receiver at 1, *SEC v. Bleidt,* No. 04cv12415–NG (D.Mass. Mar. 22, 2006). The receiver's mandate was to "institute, prosecute, defend, compromise, adjust, intervene in, or become party to" actions on behalf of Bleidt and APAM against banks. *Id.* at 1–2. He was further directed to "assist the victims of Bleidt's fraud to institute, prosecute, compromise or settle such claims as they may have against banks in their individual capacities, provided that the victims specifically authorize the Ancillary Receiver to do so." *Id.* at 2.

The ancillary receiver, along with the named plaintiffs, then brought the instant suit against Sovereign. This case concerns the period from June 2000 to November 2004, when Bleidt's fraud was discovered.[3]

#### 2. Bleidt's Operations at Sovereign

From 1995 to 2000, Bleidt ran his scheme through a business checking ac-

---

2. Though Vicinanzo had never performed any legal services for the defendant, his law firm had an ongoing relationship with Sovereign.

3. The following section summarizes evidence offered at trial under the appropriate standard. *See infra* Part II (setting forth the standard for granting a motion for new trial).

count at a Fleet Bank branch located at 125 Causeway Street, Boston, Massachusetts. *See* Trial Tr. 47–48, 75, Dec. 11, 2008. In June of 2000, Sovereign acquired the Fleet Bank branch on Causeway Street. Trial Tr. 14, Dec. 9, 2008. While the number of the APAM account changed to end with the digits 545, Sovereign continued to maintain it as a business checking account. This account is referred to as "the '545 account."

Bleidt's embezzlements took place through this account. Although there were several different ways in which the frauds occurred, plaintiffs' conversion claims relate to one tactic that Bleidt employed—indeed, the simplest one. An investor-client would send Bleidt a check for investment; Bleidt would deposit the check in the '545 account. He would then misappropriate the client's money by diverting it to other accounts that he maintained at Sovereign Bank rather than investing it as he had promised. *See* Trial Tr. 57–58, Dec. 11, 2008.

Plaintiffs claim that Bleidt converted 24 third-party checks in this fashion. A "third-party check" is a check that has been endorsed by the payee and transferred to a third-party. *Black's Law Dictionary* 1617 (9th ed. 2009). Here, Panos claims that Bleidt deposited 22 third-party checks into the '545 account. Each of checks was drawn by "The Penn Insurance and Annuity Company." Each was payable to the order of:

Bessie Panos
c/o Bradford Bleidt
164 Canal St. Ste 500
Boston MA 02114–1809

Each was in the amount of $10,951.47. Bleidt deposited the checks into the '545 account on roughly a monthly basis from November 2001 to August 2003.[4]

Similarly, Bleidt misappropriated a December 3, 2003, check in the amount of $90,000 from Fleet National Bank and payable to Langdon and Nancy Lombard. Pls.' Trial Ex. 25. He also misappropriated a December 3, 2003, check in the amount of $36,000 from Fleet National Bank and payable to Langdon F. Lombard. Pls.' Trial Ex. 26. The $90,000 check stated on its face "Executors' Commission," and the $36,000 check bore the words "DNI of the Estate/Trust." Both were deposited in the '545 account.

### 3. Sovereign's Policies During Bleidt's Fraud

Sovereign Bank had particular policies for handling third-party checks. Until July 11, 2002, Sovereign's policy was that such checks "may be accepted for deposit on an *exception* basis and ONLY with [manager] approval." Pls.' Trial Ex. 59 at S011607 (emphasis in original). If the depositing customer was not known or the relationship between the customer and the instrument's named payee was not well-established, the customer would be required to complete a signed, notarized Confirmation of Endorsement form prior to deposit. *Id.* at S011607–08.

Under the revised policy in place after July 11, 2002, tellers were to verify that "[t]he original payee's endorsement matches the payee's name" and "[t]he check meets the seven points of negotiability." *Id.* at S011623. If the check met

---

4. Specifically, the checks were either drawn or deposited on the following dates: November 4, 2001; December 4, 2001; January 2, 2002; February 4, 2002; March 4, 2002; April 1, 2002; April 24, 2002; May 31, 2002; June 24, 2002; July 30, 2002; September 3, 2002; September 30, 2002; October 25, 2002; November 2, 2002; January 6, 2003; March 24, 2003; March 25, 2003; April 24, 2003; June 4, 2003; June 24, 2003; July 25, 2003; and August 25, 2003. Pls.' Trial Ex. 61.

these criteria and the original payee was not present, it could be deposited immediately if it was for less than $15,000. *Id.* at S011624.[5] If $15,000 or more, the instrument had to be presented to a manager for approval as in the past. *Id.*

## II. STANDARD FOR GRANTING A MOTION FOR NEW TRIAL

 The plaintiffs have moved for a new trial under Federal Rule of Civil Procedure 59. A court may grant a new trial under Rule 59 when the jury's verdict is "against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." *Johnson v. Spencer Press of Maine, Inc.,* 364 F.3d 368, 375 (1st Cir.2004) (quoting *Ramos v. Davis & Geck, Inc.,* 167 F.3d 727, 731 (1st Cir.1999)). This standard is less stringent than the standard for granting judgment as a matter of law under Rule 50. *Valentin–Almeyda v. Municipality of Aguadilla,* 447 F.3d 85, 104 (1st Cir.2006); *see also* 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2531 (3d ed. 2008). "[O]n a motion for a new trial—unlike a motion for a judgment as a matter of law—the judge may set aside the verdict even though there is substantial evidence to support it." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2806, at 65 (2d ed. 1995); *accord Lama v. Borras,* 16 F.3d 473, 477 (1st Cir.1994).

 Likewise, in a new trial motion, a court "is not required to take that view of the evidence most favorable to the verdict-winner," as in motions for judgment as a matter of law. 11 Wright, Miller & Kane, *supra,* § 2806, at 65–66. While the court,

of course, should give due respect to "the collective wisdom of the jury," *id.* at 74, if after reviewing all of the evidence the court "is left with the definite and firm conviction that a mistake has been committed," it should grant a request for a new trial. *Id.* at 75. The Court is left precisely with that "definite and firm conviction" in this case with respect to the conversion claims of the Lombards and Panos.

## III. PLAINTIFFS BESSIE PANOS, NANCY LOMBARD, AND LANGDON LOMBARD ARE ENTITLED TO A NEW TRIAL ON THEIR CONVERSION CLAIMS

### A. The Governing Legal Standard

 Generally speaking, to prove conversion, the plaintiffs must show that Sovereign intentionally exercised control over property to which it had no right. In the case of a negotiable instrument, such as the third-party checks at issue here, the substantive cause of action is governed by Mass. Gen. Laws ch. 106, § 3–420(a), which codified Article III of the Uniform Commercial Code (U.C.C.):

> The law applicable to conversion of personal property applies to instruments. An instrument is also converted if . . . a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment.

*See also* Mass. Gen. Laws ch. 106, § 3–306 ("A person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument or its proceeds . . . ."). The commentary to the law makes it clear that it is intended to apply to banks.[6]

---

**5.** Although this was the policy, the testimony of Susana Seipio, a Sovereign Bank employ-

ee, suggested that manager approval was still required. *See infra* Section III.B.

**6.** The prototypical case described in the com-

Here, Bessie Panos, Nancy Lombard, and Langdon Lombard make a claim under Mass. Gen. Laws ch. 106, § 3–306 with regard to the 24 checks Bleidt deposited into the '545 account. Panos and the Lombards transferred the checks to Bleidt as a fiduciary with the intent that Bleidt invest the proceeds on their behalf. Instead, Bleidt converted the checks by depositing them into a non-fiduciary account, the '545 business account, and using the proceeds for his own purposes. As a result, Panos and the Lombards argue that they are entitled to recover the proceeds resulting from the checks' negotiation to Sovereign Bank.

██ Sovereign counters that it qualifies as a holder in due course. *See id.* §§ 3–302, 3–306 ("A person having rights of a holder in due course takes free of the claims to the instrument."). While it is a central tenet of contract and property law that an individual who receives an item from another can take no better title to the item than was held by the transferor,[7] a holder in due course is an exception. The "holder in due course" can enforce a negotiable instrument even in the face of competing third-party claims—here the claims of plaintiffs—and is only susceptible to certain "real defenses," which are set forth in Mass. Gen. Laws ch. 106, § 3–305.[8] See Mass. Gen. Laws ch. 106, § 3–306.

A holder in due course is defined by statute as a holder of a negotiable instrument that does not bear apparent evidence of forgery or alteration and who "took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in section 3–306, and (vi) without notice that any party has a defense or claim in recoupment described in subsection (a) of section 3–305." Mass. Gen. Laws ch. 106, § 3–302. Section (v) is the relevant section in the case at bar: Sovereign Bank cannot be a holder in due course of plaintiffs' checks if it took the checks with notice of plaintiffs' claim that Bleidt breached his fiduciary duties in depositing the checks in the '545 account. § 3–302(a)(2)(v).

Section 3–307 sets forth "rules that comprehensively cover the issue of when the taker of an instrument has notice of breach of a fiduciary duty and thus notice of a claim to the instrument or its proceeds." § 3–307 cmt. 1. If the requirements of section 3–307 are met, then Sovereign Bank had notice of Bleidt's breach of fiduciary duty. If it had notice of Bleidt's breach of fiduciary duty, then it also had notice of plaintiffs' claims on their checks and the proceeds therefrom. § 3–307(b)(1); *see also id.* cmt. 2 (stating that a claim that

mentary is one in which an instrument is payable to two persons, and the bank allows its negotiation over a single person's signature. In that event, the bank is liable to the other person for conversion. Mass. Gen. Laws ch. 106, § 3–420 cmt. 1.

7. *See, e.g.,* Restatement (Second) of Contracts § 336(1) (1981) ("By an assignment the assignee acquires a right against the obligor only to the extent that the obligor is under a duty to the assignor; and if the right of the

assignor would be voidable by the obligor or unenforceable against him if no assignment had been made, the right of the assignee is subject to the infirmity.").

8. "Real defenses" include infancy of the obligor, duress, "fraud in the factum," and discharge of the obligor in insolvency proceedings. Mass. Gen. Laws. ch. 106, § 3–305(a)(1). None of the real defenses could be asserted against Sovereign Bank in this case.

"a breach of fiduciary duty resulted in a misapplication of the proceeds of an instrument" is "a claim described in Section 3–306"). And if Sovereign Bank had notice of plaintiffs' claims, then it cannot qualify as a holder in due course, making it susceptible to plaintiffs' conversion claims. § 3–306; *see also* § 3–420(a).

■ Specifically, section 3–307 provides, in relevant part, that if an instrument payable to a person represented by a fiduciary (e.g., the plaintiffs) is taken from the fiduciary for value *and* the taker has *knowledge* of the fiduciary status of the fiduciary, then the taker has notice of a breach of fiduciary duty if the instrument is "deposited to an account other than an account of the fiduciary, as such, or an account of the represented person." To be sure, under section 3–307, the taker must have actual knowledge of the fiduciary status of the person tendering the check; mere "warning clues" that the individual might be a fiduciary are not sufficient. *Jelmoli Holding, Inc. v. Raymond James Fin. Servs., Inc.*, 470 F.3d 14, 19 (1st Cir.2006).

While proving knowledge is hard enough when the taker is an individual, it is even more complex when the taker is not a natural person but an entity, such as Sovereign Bank. Fortunately, the Uniform Commercial Code provides some guidance. Section 1–201 provides:

Notice, knowledge or a notice or notification received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence. An organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines. Due diligence does not require an individual acting for the organization to communicate information unless such communication is part of his regular duties or unless he has reason to know of the transaction and that the transaction would be materially affected by the information.

Mass. Gen. Laws ch. 106, § 1–201(27).

■ Translating the statutory provisions into somewhat plainer language, the plaintiffs—to prevail on their conversion claims—had to prove the following at trial: [9]

1. Bleidt was a fiduciary with respect to the individual investor-plaintiffs;

2. Sovereign Bank took checks that were payable to the individual investor-plaintiffs;

3. An individual conducting the transaction at Sovereign Bank had actual

---

9. Generally, the holder of an instrument attempting to defend against a plaintiff's claim under section 3–306 bears the burden of proving that she qualifies as a holder in due course. *See Bowling Green, Inc. v. State St. Bank & Trust Co.*, 307 F.Supp. 648, 653 n. 4 (D.Mass.1969) ("[O]ne claiming to be a holder in due course has the ultimate burden of proof when the action is not on the instrument but for conversion of it."). However, the First Circuit in *Jelmoli Holding* seemed to suggest that the claimant, not the holder, has the burden of proving the holder's knowledge

of a fiduciary breach. *See Jelmoli Holding*, 470 F.3d at 19 ("The *plaintiff* must ... show knowledge by the taker, and not just warning clues, that the person tendering the check is a fiduciary." (emphasis added)). This issue regarding the burden of proof is interesting but need not concern the Court here. Since the Court concludes that plaintiffs are entitled to a new trial even if they bear the burden of proof on the notice issue, they would obviously be entitled to a new trial if the burden rested on defendant's shoulders.

knowledge of Bleidt's fiduciary status with respect to the individual investor-plaintiffs; and

4. The instruments were deposited into an account other than an account of the fiduciary, designated as such, or an account of the individual investors.

Since plaintiffs' conversion claims are instrument-specific, they must prove these four elements with regard to each check that they claim Sovereign Bank converted.

Elements 1, 2, and 4 are not in dispute: Bleidt, as an investment advisor handling client funds, was a fiduciary with respect to the investor-plaintiffs; Sovereign Bank accepted the 24 checks payable to the investor-plaintiffs; and the checks were deposited into the '545 account, which was neither a fiduciary account nor an account of the individual investors. The question is whether a Sovereign Bank employee involved in accepting and processing the 24 checks at issue had actual knowledge of Bleidt's fiduciary status with respect to the checks' payees. The Court concludes that the evidence presented at trial strongly indicated that one individual—Causeway Street Branch Manager David Magrath—had such knowledge. Since the jury's verdict runs counter to the compelling, and largely uncontradicted, evidence that plaintiffs presented in favor of their conversion claims, the Court concludes that a new trial on these claims is warranted.[10]

## B. The Clear Weight of the Evidence Indicates That Magrath Knew of Bleidt's Fiduciary Status with Respect to Panos and the Lombards

■ The clear weight of the evidence presented at trial indicates that David Ma-

grath, the Sovereign Bank branch manager at the Causeway Street branch that serviced the '545 account, knew of Bleidt's fiduciary status with respect to Panos and the Lombards. This conclusion is supported by the following undisputed facts:

1. Magrath knew Bleidt well; Bleidt was a valued customer at the Causeway Street branch. Since Bleidt's office was only a few doors down from the Causeway Street branch, he frequently visited the branch. Magrath estimates that he saw Bleidt at the branch three or four times per month over the period from June 2000 to November 2004. Trial Tr. 22, Dec. 9, 2008. Magrath personally visited Bleidt's office approximately four times, and he even made a presentation to Bleidt's employees about opening free personal checking accounts. *Id.* at 23–25.

2. Magrath knew that Bleidt was an investment advisor. Trial Tr. 75, Dec. 9, 2008. Thus, as a matter of law, Magrath knew that Bleidt was a fiduciary with respect to the clients to whom he provided services as an investment advisor. *See, e.g., SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 191, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (describing the "delicate fiduciary nature of an investment advisory relationship") (quoting 2 Louis Loss, *Securities Regulation* 1412 (2d ed.1961)).

3. Magrath testified that he knew that Bleidt's company, Allocation Plus Asset Management Company, Inc. (APAM), managed money and

---

**10.** Plaintiffs' motions for judgment as a matter of law, in contrast, cannot be granted because of Magrath's denial that he had such knowledge, unconvincing as that denial may be.

made investments on behalf of customers. Trial Tr. 76–77, Dec. 9, 2008.

4. Magrath knew that money remained in the '545 account for short periods of time and that Bleidt would then withdraw the funds so that Bleidt "could make investments for his customers." Trial Tr. 80, Dec. 9, 2008; *see also id.* at 84.

5. From June 2001 to July 11, 2002, the period during which the first nine Panos third-party checks were accepted for deposit into the '545 account, Sovereign Bank's policies and procedures provided: "Third party endorsed items may be accepted for deposit on an *exception* basis and ONLY with CBO/CBM or manager designate approval." Pls.' Trial Ex. 59 at S011607 (emphasis in original). The acronym "CBM" stands for "community banking manager," the position held by David Magrath at the Causeway Street branch. Trial Tr. 8, Dec. 4, 2008.

6. Susana Seipio testified that only David Magrath and his boss—District Manager Cary Lynch—had authority to approve third-party checks presented for deposit at the Causeway Street branch from June 2001 to November 2004. Moreover, notwithstanding the fact that Sovereign changed its official policy on July 11, 2002, allowing third-party checks under $15,000 to be deposited without manager approval, Seipio testified that "third-party checks could not be accepted for deposit unless Mr. Magrath personally approved them for deposit." Trial Tr. 107–08, 148, Dec. 10, 2008.[11]

7. Magrath personally reviewed and signed "Confirmation of Endorsement" forms for each of the third-party checks on which the Lombards were the payees.[12] Pls.' Trial Ex. 97.

8. Approximately once each month from November 2001 to August 2003, Bleidt deposited a third-party check from "The Penn Insurance and Annuity Company" and pay-

---

11. The Court notes that defendant, in response to plaintiffs' motion for summary judgment, was content to leave undisputed the following sentence from Plaintiffs' Statement of Material Facts, "Throughout the Relevant Period, no third-party check could be accepted for deposit at the Causeway Street branch unless branch manager Magrath personally approved the check for deposit." Pls.' Statement of Material Facts ¶ 4 (document # 267). Such statements of material facts are governed by Local Rule 56. 1, which provides:

Motions for summary judgment shall include a concise statement of the material facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation. Failure to include such a statement constitutes grounds for denial of the motion.

Opposition to motions for summary judgment shall include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation. Copies of all referenced documentation shall be filed as exhibits to the motion or opposition. *Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.*

Local R. 56.1 (emphasis added).

12. Sovereign Bank used confirmation of endorsement forms to confirm the validity of payee endorsements on third-party checks.

able to "Bessie Panos c/o Bradford Bleidt" into the APAM '545 account. Each check was in the amount of $10,951.47. Pls.' Trial Ex. 61.

9. The two checks deposited in the APAM '545 account that were payable to the Lombards were for the relatively large amounts of $90,000 and $36,000. The $90,000 check bore the words "Executors' Commission," and "DNI of the Estate/Trust" was printed on the $36,000 check. Pls.' Trial Exs. 25, 26.

10. While Magrath testified that it was not his practice during the relevant period to review all third-party checks, see Trial Tr. 33–35, Dec. 9, 2008, this testimony is contradicted both by Sovereign's policy and Seipio's testimony.

These facts strongly indicate that Magrath knew that Bleidt held the third-party checks payable to Panos and the Lombards in his capacity as a fiduciary. Magrath plainly was aware that Bleidt offered investment advisory services through APAM. And the most reasonable explanation for why Panos and the Lombards transferred the checks to Bleidt is that they intended for Bleidt to deposit them and then invest the proceeds on their behalf. Indeed, there is no other basis for Panos and the Lombards to have transferred checks to Bleidt, an investment advisor, for deposit into an account owned by APAM, the entity ostensibly created by Bleidt to provide investment advisory services. Anyone who reviewed the 24 checks at issue and knew Bleidt's status as an investment advisor would almost certainly have concluded that Panos and the Lombards entrusted the checks to Bleidt as a

fiduciary. The relatively large amounts of the checks (thousands of dollars each), the frequency of the Panos checks (deposits occurred on approximately a monthly basis), the use of "c/o" on the Panos checks (with "c/o" meaning "care of"),[13] and the fact that the checks were third-party checks—all of these factors strongly indicated that Bleidt had custody of the checks only in his fiduciary role as an investment advisor. Since Magrath knew all of this information, the Court has little doubt that Magrath also knew that Bleidt held Panos and the Lombards' checks as a fiduciary. Although the Court is not prepared to hold that plaintiffs are entitled to judgment as a matter of law because such a judgment would require a determination regarding the credibility of Magrath's testimony, it concludes that plaintiffs' evidence of Magrath's knowledge was so compelling that a new trial is required.

Sovereign Bank tries to avoid this conclusion by arguing that the jury may have found that Magrath did not know the status of the particular checks at issue here—that (1) Magrath did not review the third-party checks originally made payable to Panos and the Lombards, and (2) Magrath did not know that the third-party checks were transferred to Bleidt in his capacity as an investment advisor for Panos and the Lombards.

■■■ Sovereign's first argument is not a proper basis for upholding the jury's verdict. First, Magrath obviously reviewed the checks payable to the Lombards; his signature appears on the Confirmation of Endorsement forms that had to be completed before Sovereign Bank would accept the checks. Second, under Mass. Gen. Laws ch. 106, § 1–201(27), an organization such as Sovereign Bank has "knowledge" of a fact when it is brought to the

13. See Black's Law Dictionary 291 (9th ed.2009) (defining the abbreviation "c/o").

attention of the employee conducting the transaction in question, *or* "when it would have been brought to his attention if the organization had exercised due diligence." Thus, Magrath's testimony that it was not his practice to review third-party checks is inconsequential. *See* Trial Tr. 34, Dec. 9, 2008. He may very well have failed to follow Sovereign Bank's written protocol for reviewing third-party checks. But had Sovereign Bank exercised due diligence by enforcing its own policies, then Magrath would have personally reviewed at least some, if not all, of the nine Panos checks deposited from June 2001 to July 11, 2002. *See* Pls.' Trial Ex. 59 at S011607. Reviewing only a handful of these checks, which again were deposited on roughly a monthly basis and bore the tell-tale abbreviation "c/o," would have made it apparent to Magrath that Bleidt was acting as Panos' investment advisor and that Panos entrusted the checks to Bleidt as a fiduciary to deposit and invest on her behalf. "Due diligence" then would have mandated that Magrath inform his superiors and other Sovereign Bank employees that Bleidt was mishandling checks from clients by depositing them in a non-fiduciary account. In other words, had Magrath properly followed company policy, Sovereign Bank—as an organization—would quickly have gained knowledge of Bleidt's fiduciary status with respect to Panos. Thus, under section 1–201, Sovereign Bank can be charged with such knowledge with respect to each of the 22 third-party checks payable to Panos and deposited in the APAM '545 account.

Sovereign's second argument—that Magrath may not have known that the third-party checks were transferred to Bleidt in his capacity as an investment advisor for Panos and the Lombards—is somewhat more problematic, but barely so. No one ever explicitly said the following to Magrath: "Panos and the Lombards have hired Bleidt as their investment advisor. They have entrusted him with checks payable to them. Panos and the Lombards intend for Bleidt to invest the proceeds of the checks on their behalf. Thus, Bleidt is a fiduciary of Panos and the Lombards with respect to the checks." *Cf.* Trial Tr. 87, Dec. 10, 2008 (responding to the question, "[D]id Brad Bleidt ever tell you he was a trustee or a fiduciary for any client or customers," Magrath answered, "No"). But Magrath did not need to be confronted with such an explicit statement of Bleidt's fiduciary status for plaintiffs to prevail on their conversion claims. While it is *possible* that the plaintiffs transferred the checks to Bleidt for some purpose other than investment on their behalf, the overwhelming evidence points in the opposite direction. Sovereign Bank's argument that Magrath was unaware that Bleidt was serving as Panos and the Lombards' investment advisor on this record seems, to put it mildly, highly implausible. The most reasonable explanation for plaintiffs entrusting their checks to Bleidt is that they wanted the proceeds of the checks to be invested on their behalf.

## IV. CONCLUSION

Plaintiffs Bessie Panos, Nancy Lombard, and Langdon Lombard are entitled to a new trial on their conversion claims. The clear weight of the evidence presented at trial indicated that (1) Bleidt was a fiduciary with respect to the plaintiffs; (2) Sovereign Bank took checks that were payable to the plaintiffs; (3) David Magrath—one of the employees involved in accepting the checks on Sovereign Bank's behalf—had actual knowledge of Bleidt's fiduciary status with respect to the plaintiffs; and (4) the plaintiffs' checks were deposited into an APAM business checking account that was neither a fiduciary account nor an account owned by plaintiffs.

Although plaintiffs' case was not sufficiently overwhelming to entitle them to judgment as a matter of law, the Court concludes that a new trial is warranted since, after reviewing all of the evidence presented at trial, it is left with a definite and firm conviction that the jury's verdict was mistaken. Accordingly, the Court **ORDERS THAT THE JURY'S VERDICT BE SET ASIDE IN PART** and that **Plaintiffs Bessie Panos, Nancy Lombard, and Langdon Lombard be GRANTED A NEW TRIAL** on their conversion claims. These claims are to be consolidated with the Intervenors' claims.

For the reasons set forth herein, Plaintiffs' Preliminary Motion for New Trial (**document #400**) is **GRANTED IN PART AND DENIED IN PART.** Plaintiffs' Renewed Motion for New Trial (**document #447**) is **GRANTED IN PART AND DENIED IN PART.** The Court's September 5, 2009, decision with respect to the other grounds set forth in those motions stands. Plaintiffs' Post-verdict Motion for Judgment as a Matter of Law on Conversion Claims (**document #397**) is **DENIED.** Plaintiffs' Renewed Motion for Judgment as a Matter of Law on Conversion Claims (**document #446**) is **DENIED.**

**SO ORDERED.**