

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00170-CV

_____

UNITED HEALTHCARE OF TEXAS, INC., OPTUM HEALTH CARE SOLUTIONS LLC D/B/A OPTUM HEALTHCARE SOLUTIONS, INC., UNITED HEALTHCARE, INC., D/B/A UNITED HEALTHCARE INSURANCE COMPANY,[1] UNITED HEALTHCARE COMMUNITY PLAN OF TEXAS, L.L.C., EVERCARE OF TEXAS, L.L.C., UNITED HEALTHCARE BENEFITS OF TEXAS, INC., UNITED HEALTHCARE SERVICES, INC., AND UNITEDHEALTH GROUP, INC., Appellants

V.

LOW-T PHYSICIANS SERVICE, P.L.L.C., LOW-T PHYSICIANS PROFESSIONAL ASSOCIATION, AND LOW-T PHYSICIANS GROUP, P.L.L.C., Appellees

---

[1]Appellants indicate that United Healthcare Insurance Company was erroneously sued as "United Healthcare, Inc., d/b/a United Healthcare Insurance Company," but Appellants do not ask this court to revise the style of the case. For consistency, we retain the existing style as it was used by the trial court and by this court in a previous interlocutory appeal. *Cf. United Healthcare of Tex., Inc. v. Low-T Physicians Serv., P.L.L.C.*, No. 02-20-00033-CV, 2021 WL 210846, at *1 (Tex. App.—Fort Worth Jan. 21, 2021, no pet.) (mem. op.).

On Appeal from the 342nd District Court
Tarrant County, Texas
Trial Court No. 342-303717-18

Before Sudderth, C.J.; Wallach and Walker, JJ.
Opinion by Chief Justice Sudderth

**OPINION**

After Appellant United Healthcare of Texas, Inc. (working with its affiliated entities)[2] determined that it had overpaid Appellee Low-T Physicians Service, P.L.L.C. (and its affiliated entities)[3] for health-insurance claims, United requested a refund of more than $2 million, and Low-T attempted to settle the claim by mailing United a check for approximately $24,000. Low-T also mailed a letter detailing its settlement proposal to many of the United addresses listed in the parties' claim-related correspondence. When United's check-processing contractor automatically cashed Low-T's check, Low-T argued that it was an accord and satisfaction of United's $2 million claim. The trial court agreed with Low-T, and it issued a declaratory judgment confirming that the check was an accord and satisfaction under Section 3.311 of Texas's codified version of the Uniform Commercial Code (UCC). *See* Tex. Bus. & Com. Code Ann. § 3.311.

In one broad issue, United claims that (1) the great weight and preponderance of the evidence establishes the applicability of two statutory exceptions to accord and

---

[2]We refer to Appellants—United Healthcare of Texas, Inc., Optum Health Care Solutions, LLC d/b/a Optum Healthcare Solutions, Inc., United Healthcare, Inc., d/b/a United Healthcare Insurance Company, United Healthcare Community Plan of Texas, L.L.C., Evercare of Texas, L.L.C., United Healthcare Benefits of Texas, Inc., United Healthcare Services, Inc., and UnitedHealth Group, Inc.—collectively as "United."

[3]We refer to Appellees—Low-T Physicians Service, P.L.L.C., Low-T Physicians Professional Association, and Low-T Physicians Group, P.L.L.C.—collectively as "Low-T."

satisfaction and (2) the evidence is so weak that it would be manifestly unjust to apply the due diligence statute that overrides the statutory accord and satisfaction exceptions. Because the evidence supports application of the due diligence override provision, and because this override renders the accord and satisfaction exceptions unavailable, we will affirm.

## I. Accord and Satisfaction Under the Texas UCC

Section 3.311 of the Texas UCC codifies the common law doctrine of accord and satisfaction.[4] *See Flores v. Hansen*, No. 2-09-465-CV, 2010 WL 3618737, at *3 n.5 (Tex. App.—Fort Worth Sept. 16, 2010, no pet.) (mem. op.); *Milton M. Cooke Co. v. First Bank & Tr.*, 290 S.W.3d 297, 304–05 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Generally, a claim that is subject to a bona fide dispute is extinguished by an accord and satisfaction if the person against whom the claim is asserted tenders a check[5] to the claimant, the tendered check is in full satisfaction of the claim, the check (or accompanying correspondence) bears a conspicuous statement to that effect, the tender is in good faith, and the claimant cashes the check. *See* Tex. Bus. & Com. Code Ann. § 3.311(a), (b). Even when these elements are established, though, there are two statutory exceptions—set forth in Subsection (c) of Section 3.311—that allow

---

[4]Texas's version of the UCC is codified in Title 1 of the Texas Business and Commerce Code. *See* Tex. Bus. & Com. Code Ann. tit. 1.

[5]This statute applies to negotiable instruments. *See Flores*, 2010 WL 3618737, at *3; *see also* Tex. Bus. & Com. Code Ann. § 3.104(b) (defining "[i]nstrument" as "a negotiable instrument").

4

claimants to avoid inadvertent acceptance of an accord and satisfaction instrument.[6] *Id.* § 3.311(c), cmts. 5–6. But we need not detail those two exceptions because a claimant cannot rely on either of them if Subsection (d) applies, i.e., "within a reasonable time before collection of the instrument was initiated, the claimant . . . knew that the instrument was tendered in full satisfaction of the claim." *Id.* § 3.311(d). As relevant here, for an organization, "knowledge . . . is effective . . . from the time it would have been brought to the . . . attention [of the individual conducting the transaction] if the organization had exercised due diligence." *Id.* § 1.202(f); *see id.* § 3.311 cmt. 7. This due diligence override forms the dispositive issue in United's appeal.

## II. Background

The due diligence issue turns on whether and when the United representatives handling Low-T's claim should have known that Low-T was tendering its settlement check in full satisfaction of that claim. *See id.* §§ 1.202(f), 3.311(d). But this question is muddied by the numerous mailing addresses that United used throughout the parties' correspondence.

---

[6]Generally, the Subsection (c) exceptions allow a claimant to avoid an accord and satisfaction if it either (1) conspicuously designates a person, office, or place to receive debt-related communications and settlement instruments and demonstrates that the designated recipient did not receive the settlement or (2) promptly refunds the inadvertently accepted settlement to the person against whom the claim is asserted. Tex. Bus. & Com. Code Ann. § 3.311(c), cmts. 5–6.

**A. Claim & Correspondence**

In December 2017, Michael Berger—an associate general counsel for United—sent a letter from his Minnesota office to Low-T notifying Low-T that an audited sample of its United healthcare claims revealed[7] that United had overpaid Low-T by approximately $2,359,902.33. The notice indicated that Low-T should "call the investigator, Joni Stone at [her phone number] to let her know if you'd like to expand the audit." If Low-T wanted to appeal the overpayment determination, it was directed to do so by submitting its written position and documentation to "United Payment Integrity[,] Attn: Recovery Investigations" using a mailing address in Forest Park, Georgia.

Later that month, Low-T's general counsel,[8] David Moraine, responded by sending a letter to Stone at the Forest Park address and to Berger at his Minnesota address. The letter expressed "a desire to settle" and effectively initiated United's appeals process. In January, Stone wrote back on United letterhead—specifically, letterhead for "United Payment Integrity[,] Attn: Recovery Investigations"—that

---

[7]United "contended it had identified coding 'errors' totaling less than $10,000.00 during [a] three-year period from '[a] sample of 11 UnitedHealthcare Employer and Individual records comprising 482 claim lines paid[,]' . . . . then [it] 'extrapolated' an amount due across a 'paid claims universe' to come up with the $2.4 million amount demanded." *United Healthcare*, 2021 WL 210846, at *4.

[8]Moraine's correspondence listed his title as "[g]eneral [c]ounsel" on some communications and as "[c]hief [l]egal [o]fficer" on others. At trial, Moraine testified that he was the "chief legal officer." He confirmed that, although he has used different titles during his time working for Low-T, his job duties have not changed.

6

contained an Atlanta P.O. Box address. She acknowledged receipt of Moraine's letter—the letter that had been mailed to her at the Forest Park address—and she directed Low-T to send its appeal documentation to the Forest Park address.

After reviewing Low-T's appeal documentation, in February 2018, Stone sent what she later described as "United's final findings . . . after appeal."[9] As before, Stone's letter was on United's "Payment Integrity" letterhead bearing the company's Atlanta P.O. Box address. Stone indicated that United's review of Low-T's documentation had reduced the overpayment amount to $2,031,562.95, and she asked Low-T to "issue a refund check payable to UnitedHealthcare and [to] mail the check, along with a copy of this letter and the enclosed claim list" to a lockbox address in Hapeville, Georgia.

Stone then began exchanging emails with Moraine regarding United's claim. Unlike her letters, Stone's email signature block listed the Minnesota address that had been used in Berger's correspondence. The following month, in March 2018, Moraine followed up on the email exchanges with a formal letter addressed to Stone in "United Payment Integrity[,] Attn: Recovery Investigations" at the Forest Park address. He asserted numerous legal challenges to United's overpayment determination. Berger—rather than Stone—responded to these legal challenges, and he did so on letterhead that contained United's Minnesota address. In his response,

---

[9]Stone later hedged by stating that the findings were "not necessarily final." But she acknowledged that she had described them as "final findings."

7

Berger told Low-T to "contact Joni Stone at [phone number] to discuss settlement . . . or me if you have any questions about the content of this letter."

More email exchanges ensued between Stone and Moraine, with Stone's signature block consistently listing United's Minnesota address. However, at one point in the correspondence, Stone indicated that she was having trouble opening Moraine's encrypted email, and she stated that he "may provide [his] communication via letter to the Forest Park, Georgia address unless [the] communication doesn't contain PHI, in which case [he] c[ould] send [her] an unencrypted email."

In June 2018, the parties had a teleconference to discuss settlement options, and both Berger and Stone participated. Later, at Low-T's request, Stone mailed Moraine hard-copy documentation for the "universe of [audited] claims." The documentation was accompanied by a cover letter on United's "Payment Integrity" letterhead bearing the company's Atlanta P.O. Box address, and at the end of the letter, Stone's signature block listed her as part of the "United Payment Integrity" division.

At no point in the parties' correspondence did United expressly state Stone's physical location or expressly identify Stone's preferred mailing address.

## B.    Settlement Offer & Check

Finally, in a letter mailed August 31, 2018, Moraine offered to settle the dispute for $24,665.21. Given United's numerous mailing addresses, Low-T mailed seven copies of its settlement proposal. It sent the settlement letter via certified mail to

Stone at the Forest Park address, and it sent the letter via first-class mail to (1) Berger at the Minnesota address, (2) United's Atlanta P.O. Box address, and (3) three other United addresses—San Antonio, Richardson, and Salt Lake City—listed in Low-T's provider agreements. Each settlement letter was accompanied by a copy of the settlement check. The check itself, meanwhile, was mailed (with the seventh copy of the settlement letter) to United's Hapeville lockbox. The check bore the notation, "[f]ull and final payment [claim number]" and was issued by "Low-T Shared Services, LLC"—a nonparty.

## C. Delivery & Due Diligence

Low-T later produced a receipt from the United States Postal Service (USPS) showing that the settlement letters had been mailed on August 31 and that, at the time of mailing, the USPS gave an "Expected Delivery Da[te]" of Tuesday, September 4. United admitted that it had received at least two of the copies of Low-T's settlement letter—the copy mailed to Salt Lake City and the copy mailed to Forest Park—on September 5. And USPS tracking information confirmed the delivery of Low-T's certified letter to Forest Park on September 5.[10]

Six days later, on September 11, the Hapeville lockbox received Low-T's check. Berger explained at trial that the lockbox was overseen by Wells Fargo and was used

---

[10]Two days later, Stone—seemingly unaware of the settlement offer—emailed Moraine to schedule a time to discuss resolution of the case. Moraine did not respond.

by United to streamline payment processing. The lockbox personnel followed their standard procedure by (1) depositing Low-T's check and (2) scanning the check and accompanying settlement letter into United's document-tracking system. Then, the following morning, they notified the relevant United representatives of the check and letter. When Stone received this notification, she emailed Moraine and rejected the settlement.

## D. Refund

United promptly issued a refund check, but rather than paying the money to Low-T, United made the refund check payable to the entity that had issued the settlement check: Low-T Shared Services.[11] At trial, Moraine testified that Low-T Shared Services was the "paymaster" for Low-T's offices; he equated the paymaster entity's check with a cashier's check.[12]

## E. Lawsuit & Trial

Low-T then filed suit against United seeking (among other things) a declaratory judgment that the settlement check was an accord and satisfaction of United's claim. United counterclaimed for (among other things) declaratory judgment and breach of

---

[11]Because United issued the refund check to the nonparty that had issued the settlement check rather than to the person against whom the claim was asserted, Low-T argued that United did not qualify for the Subsection (c)(2) exception to accord and satisfaction. *See* Tex. Bus. & Com. Code Ann. § 3.311(c)(2). The Subsection (d) due diligence override renders the Subsection (c) exceptions unavailable, though, so we need not address this issue to resolve the appeal. *Id.* § 3.311(d); Tex. R. App. P. 47.1.

[12]Low-T directed Low-T Shared Services to reject United's refund check.

contract. Low-T responded with accord and satisfaction again, now as an affirmative defense. The accord and satisfaction issue was tried to the bench. *Cf. United Healthcare*, 2021 WL 210846, at \*9–10 (rejecting argument that accord and satisfaction issue was subject to arbitration).

Only three witnesses testified: Moraine, Stone, and Berger. Stone and Berger claimed that they did not know about the settlement offer until after the check had been deposited. They explained that the Hapeville lockbox personnel automatically cashed checks and that although the lockbox had procedures to notify the relevant United representative of a check, the notification occurred the following morning.

Accordingly, Stone indicated that she was not aware of the settlement letter or check until she received the notification from the lockbox personnel on September 12. She officed in Minnesota—the same office address as Berger—and not in Forest Park. Stone insisted that the Forest Park address was only appropriate for appeal-related documents, not settlement letters or general correspondence.

Berger testified that the Forest Park address was a regional mail office responsible for "intaking mail" related to specific job functions, including overpayment appeals. He confirmed that, before the settlement, the Forest Park mail center had routed Moraine's letters to Stone. But like Stone, he insisted that this was not the proper address to use to correspond with her.

As for Berger's copy of the settlement letter, Berger testified that he had received his own copy of the letter but not until after the settlement check had been

11

cashed. When Low-T impeached Berger with his deposition—in which he had testified that he did not recall receiving his own copy of the settlement letter and that if he had received it, he "probably" would not have kept it "since [he] saw that Ms. Stone was also addressed on the letter"—Berger explained that, after the deposition, he had discovered a copy of the settlement letter in his files. He stated that he did not know the date on which he had received the letter, but he knew that it must have been after the lockbox notification on September 12 because "if [he] had received the letter prior to September 12, [he] would have acted on it."

None of the witnesses described the procedures for routing information from the Forest Park mail office to the appropriate recipient. Nor did they explain what had happened to the other three settlement letters that Low-T had mailed to United at its Atlanta P.O. Box address and its Richardson and San Antonio addresses.

## F.    Judgment & Findings

The trial court entered judgment for Low-T.[13]   In its accompanying (and commendably thorough) findings of fact and conclusions of law,[14] it found that

---

[13]Although the accord and satisfaction judgment was interlocutory when it was entered, the parties subsequently nonsuited their remaining claims, making the judgment final and appealable.

[14]United emphasizes that the trial court adopted "verbatim, the findings and conclusions tendered by Low-T." But "the Texas Supreme court has not adopted differing standards of review for findings of fact adopted verbatim from a prevailing party's proposed findings of fact versus findings of fact not adopted verbatim or modified by the trial court." *Norstrud v. Cicur*, No. 02-14-00364-CV, 2015 WL 4878716, at *4 (Tex. App.—Fort Worth Aug. 13, 2015, no pet.) (mem. op.).

12

United had not proved that it qualified for either of the two Subsection (c) exceptions to accord and satisfaction,[15] but that even if United had so proved, the Subsection (d) due diligence override applied because "Defendants did not implement or, if they had them, did not follow, such routines or procedures for the settlement letter and copy of the settlement check addressed to Stone that was received at the Forest Park address on September 5, 2018"; and "Defendants received Plaintiffs' letter on

[15]Specifically, the trial court found that:

A reasonable time before the Plaintiffs' tender, Defendants sent a conspicuous statement . . . designat[ing] Joan Stone as a 'person' responsible for negotiating a settlement with Plaintiffs, and designat[ing] the Forest Park address as the 'office' and 'place' for Plaintiffs to send communications to Stone and Defendants concerning the Overpayment Demand. [United] likewise clearly designated the Hapeville address as an 'office' or 'place' to receive instruments tendered as full satisfaction of the disputed debt.

. . . Plaintiffs delivered the settlement offer and a copy of the check to the persons, offices, and places designated by Defendants . . . and Defendants received those documents. . . .

. . . .

. . . Because Defendants had previously sent Plaintiffs a statement [designating a recipient] in compliance with [Subsection (c)(1)], Defendants had no right under [Subsection (c)(2)] to avoid the accord and satisfaction by tendering repayment . . . .

. . . Defendants' attempt to tender repayment under [Subsection (c)(2)] was also ineffective because the attempted repayment was not tendered to 'the person against whom the claim was asserted' but rather, to 'Low-T Shared Services, L.L.C.,' against whom no Defendant has asserted a claim for repayment. [Internal citations omitted.]

13

September 5, 2018," and they "either knew on September 5, 2018[,] that Plaintiffs were tendering . . . the settlement check in full satisfaction of the [claim], or had Defendants exercised due diligence, that fact would have been brought to the attention of Berger or Stone, the individuals conducting the transaction, before Defendants . . . negotiated the settlement check," which occurred "six days later . . . on September 11, 2018."

## III. Discussion

United does not dispute that Low-T established the basic elements of statutory accord and satisfaction under the Texas UCC.[16] *See* Tex. Bus. & Com. Code § 3.311(a), (b). United argues, though, that the trial court erred by (1) failing to apply at least one of the two statutory exceptions to accord and satisfaction despite the great weight and preponderance of the evidence supporting the exceptions and (2) applying

---

[16]United's brief repeatedly hints at challenges to the trial court's interpretation of Section 3.311, but it does not raise or brief those hints as separate issues. For example, United alleges that there is a "meeting of the minds" requirement for common law accord and satisfaction, but it concedes that "[t]he Texas UCC controls the issues addressed at trial," and it does not assert that the "meeting of the minds" requirement should have been applied as an element of statutory accord and satisfaction under the Texas UCC. Elsewhere in its brief, United argues that, if Low-T Shared Services did not qualify as "the person against whom a claim was asserted" for purposes of receiving United's settlement refund, then the settlement check issued by Low-T Shared Services could not have satisfied the elements of accord and satisfaction in the first place. But again, United does not assert that the elements of accord and satisfaction were not satisfied; indeed, it argues that Low-T Shared Services was eligible to both issue the settlement check and receive the refund check on behalf of Low-T.

14

the Subsection (d) due diligence override despite weak, factually insufficient evidence. The latter issue is dispositive.

## A. Standard of Review

When reviewing the factual sufficiency of a trial court's factfindings,[17] we must consider all the pertinent record evidence to determine if the challenged factfinding is so contrary to the great weight and preponderance of the evidence—or, put differently, if the credible evidence supporting the factfinding is so weak—that the factfinding must be set aside and a new trial ordered. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g). The factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony; we cannot substitute its judgment with our own. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

A trial court's conclusions of law, though, are reviewed de novo. *Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020); *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 127 (Tex. App.—Fort Worth 2016, no pet.). This includes matters of statutory construction. *Hegar*, 605 S.W.3d at 40. So, to the extent that United challenges the trial court's interpretation of the due diligence override or another

---

[17]An appellant may challenge a trial court's factfindings for evidentiary sufficiency just as it may challenge a jury's answers for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).

15

provision of the Texas UCC,[18] the trial court's interpretation is not binding on us, but we will not reverse the judgment based on an incorrect conclusion of law as long as the controlling factfindings support the judgment on a correct legal theory. *Super Ventures, Inc.*, 501 S.W.3d at 127; *Wise Elec. Coop., Inc. v. Am. Hat Co.*, 476 S.W.3d 671, 679 (Tex. App.—Fort Worth 2015, no pet.).

A uniform act such as the UCC "should be construed to promote uniformity with other jurisdictions." *1/2 Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 391 (Tex. 2011); *see* Tex. Gov't Code Ann. § 311.028 ("A uniform act included in a code shall be construed to effect its general purpose to make uniform the law of those states that enact it."). "[I]n determining and applying the Texas version of the Uniform Commercial Code, we may consider and apply pertinent decisions from other jurisdictions." *Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 773 n.2 (Tex. App.—Fort Worth 2005, pet. granted) (op. on reh'g).

## B.  Subsection (d) Due Diligence Override

Even assuming—as United claims—that the great weight and preponderance of the evidence demonstrated United's entitlement to one of the two statutory

---

[18]With two exceptions—two nondispositive issues we need not address—the substance of United's arguments takes issue with the trial court's factfindings rather than with its interpretations of the UCC.  And to the extent that the trial court's factfindings are incorrectly designated as conclusions of law or vice versa, the trial court stated that "the incorrect designation shall be disregarded and the specified finding and/or conclusion of law shall be deemed to have been correctly designated herein."  We therefore construe United's arguments as factual sufficiency challenges.

16

exceptions to accord and satisfaction, the evidence is still factually sufficient to support entry of a judgment for Low-T based on the trial court's Subsection (d) findings.

As previously noted, Subsection (d) renders the two statutory exceptions unavailable "if the person against whom the claim is asserted proves that within a reasonable time before collection of the instrument was initiated, the claimant, or an agent of the claimant having direct responsibility with respect to the disputed obligation, knew that the instrument was tendered in full satisfaction of the claim." Tex. Bus. & Com. Code Ann. § 3.311(d). Although the Texas UCC defines "[k]nowledge" as "actual knowledge," *see id.* § 1.202(b), it further clarifies that, for an organization, "knowledge . . . is effective for a particular transaction from the time it is brought to the attention of the individual conducting that transaction and, in any event, from the time it would have been brought to the individual's attention if the organization had exercised due diligence," *id.* § 1.202(f); *see id.* § 3.103(d) (noting that the general definitions in Chapter 1 apply to Chapter 3), § 3.311 cmt. 7 (citing definition of knowledge previously codified at Section 1.201 and currently codified at Section 1.202). The First Circuit has analogized this due diligence standard to the negligence standard—the organization has knowledge if its point of contact knew or should have known. *Cf. Jelmoli Holding, Inc. v. Raymond James Fin. Servs., Inc.*, 470 F.3d 14, 20 (1st Cir. 2006) (quoting due diligence standard in Massachusetts UCC and noting that it "makes clear that it is what [the claimant's representative] knew that

17

centrally matters and that other information elsewhere in the company files is imputed to [the claimant's representative] only if it was negligent of the company not to bring it to his attention").

Here, Low-T all but concedes that the United representatives involved in Low-T's case—Stone and Berger—had no subjective awareness of the settlement proposal before the check was cashed. The question is whether they should have known, i.e., whether the settlement offer "would have [already] been brought to [their] attention if the organization had exercised due diligence."[19] Tex. Bus. & Com. Code Ann. § 1.202(f).

The Texas UCC provides that an organization "exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction and there is reasonable compliance with the routines." *Id.* However, due diligence does not "require an individual acting for the organization to communicate information unless the communication is part of the individual's regular duties or the individual has reason to know of the transaction and that the transaction would be materially affected by the information." *Id.* Based on these statutory descriptions of due diligence, United argues that there was factually

---

[19]United's brief repeatedly emphasizes that "actual knowledge" is required under Subsection (d), and it states that "[t]he text of Section 3.311(d) refers to 'knowledge' and mentions nothing about due diligence or routines for communicating information." But United concedes that the plain language of the Texas UCC defines organizational "knowledge" with reference to the due diligence inquiry.

insufficient evidence to impute knowledge to Stone or Berger because there was no testimony regarding (1) any routines for forwarding communications received at United's mailing addresses (other than the lockbox address) to the appropriate United representatives or (2) United's compliance or noncompliance with those routines.[20]

It is true that neither party presented evidence regarding the details of United's procedures for routing information received at a non-lockbox mailing address. But while the Texas UCC provides that an organization "exercises due diligence if it maintains reasonable routines . . . and there is reasonable compliance with the routines," the statute does not state that this is the only method of proving due diligence. *Id.* A lack of due diligence—or more accurately, a finding that the organization's point of contact would have known had the organization exercised due diligence—can be supported by other evidence. And it is in this case.

### 1. Berger's Letter

The trial court found that Berger was one of the "individual[s] conducting th[e] transaction" with "direct responsibility with respect to the disputed obligation." Tex. Bus. & Com. Code Ann. §§ 1.202(f), 3.311(d). In other words, what he knew or

---

[20]United also alleges that the trial court's Subsection (d) findings are "legally unsupported" because "the commentary to the Texas UCC expressly states that tendering a check to a lockbox does not impute knowledge to a claimant." *Cf.* Tex. Bus. & Com. Code Ann. § 3.311 cmt. 7. But the trial court's findings and conclusions do not indicate that its Subsection (d) findings were based on the lockbox personnel's knowledge; rather, the Subsection (d) findings were based on the knowledge that Stone and Berger would have had if United had exercised due diligence.

should have known could be used to satisfy the due diligence standard. *See id.* §§ 1.202(f), 3.311(d).

And there was evidence that Berger was mailed his own copy of the settlement letter at his correct address in Minnesota, that the letter had an estimated delivery date of September 4, that two other settlement letters mailed at the same time were successfully delivered to their destinations on September 5, and that Berger's letter ultimately made its way into his files. Berger testified that he discovered the letter in his files and did not know the date on which he had received it. Although he surmised that "[i]t would have been after September 12th," the trial court, as the factfinder, had the discretion to believe or disbelieve all or any of Berger's testimony. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761, 774–75 (reiterating that "the jury [i.e., factfinder] is the sole judge of the credibility of witnesses and the weight to be given to their testimony" and that "the jury 'could believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness'" (quoting *Pilkington v. Kornell*, 822 S.W.2d 223, 230 (Tex. App.—Dallas 1991, writ denied)). Exercising this discretion, the factfinder could have doubted Berger's trial conjecture and concluded—based on (1) Berger's deposition testimony that he did not recall receiving the letter and would "[p]robably not" have kept it, (2) his ultimate discovery of the settlement letter in his files, and (3) the USPS evidence—that Berger, an "individual conducting th[e] transaction," had received his copy of the settlement letter up to six days before the check was cashed. *Cf. Milton M. Cooke Co.*, 290 S.W.3d

20

at 310–11 (applying UCC's due diligence definition in accord and satisfaction case and holding that claimant bank had no knowledge under Subsection (d) where trial court found that the debtor "delivered the Full Satisfaction Checks to [the claimant bank's] tellers" and not to anyone "with knowledge of the forgery dispute" or the authority to accept a settlement check).

Six days' notice provided an ample opportunity for United to intervene before Low-T's settlement check was received, much less cashed. Tex. Bus. & Com. Code Ann. § 1.205(a) ("Whether a time for taking an action required by [the UCC] is reasonable depends on the nature, purpose, and circumstances of the action."). Indeed, as Low-T points out, the Seventh Circuit has held that even three days' notice of a settlement instrument qualifies as "a reasonable time" under the accord and satisfaction statute in Illinois's version of the UCC. *IFC Credit Corp. v. Bulk Petroleum Corp.*, 403 F.3d 869, 873 (7th Cir. 2005) (holding case "f[ell] squarely within" Subsection (d) when designated point of contact received copy of letter and check three days before check was cashed). The record thus supports the trial court's finding that six days was "a reasonable time before collection of the instrument." Tex. Bus. & Com. Code Ann. § 3.311(d).

Putting these pieces together, there was factually sufficient evidence that, "within a reasonable time before collection of the instrument," a copy of Low-T's settlement letter and check—making plain "that the instrument was tendered in full satisfaction of the claim," *id.*—was delivered to Berger's Minnesota office and "would

21

have been brought to [his] attention if the organization had exercised due diligence." *Id.* § 1.202(f); *see id.* § 3.311 cmt. 7.

United contends, though, that Berger's imputed knowledge is inapposite because the great weight and preponderance of the evidence showed that Stone was the only "individual conducting th[e] transaction."[21] But even if this were the case, Berger's imputed awareness of the settlement still supports a finding that Stone should have known of the settlement prior to the check's cashing.

As the associate general counsel involved in Low T's claim, Berger "ha[d] reason to know of the [Low-T] transaction and that the transaction would be materially affected by the [settlement] information." *Id.* § 1.202(f). He sent Low-T the initial notification of United's overpayment determination, he responded to Low-T's legal arguments in a May 2018 letter, he joined a settlement-focused conference

---

[21]United argues that, because it allegedly designated Stone as the point of contact for claim-related communications in compliance with Subsection (c)(1), Stone was the only "individual conducting th[e] transaction" whose knowledge could satisfy Subsection (d). *See* Tex. Bus. & Com. Code Ann. §§ 1.202(f), 3.311(c), (d). But Comment 7 to Section 3.311 rejects this interpretation of the "individual conducting the transaction":

> [T]he "individual conducting that transaction" is an employee or other agent of the organization having direct responsibility with respect to the dispute. For example, if the check and communication are received by a collection agency acting for the claimant to collect the disputed claim, obtaining payment of the check will result in an accord and satisfaction *even if the claimant gave notice, pursuant to subsection (c)(1), that full satisfaction checks be sent to some other office*.

*Id.* § 3.311 cmt. 7 (emphasis added).

with Low-T, and he received or was copied on much of the correspondence between Stone and Moraine. As someone who knew of the transaction and the material effect of the settlement letter, due diligence required him to communicate the settlement letter to Stone. *Id.* ("Due diligence does not require an individual acting for the organization to communicate information *unless* . . . the individual has reason to know of the transaction and that the transaction would be materially affected by the information." (emphasis added)). And the trial court could have concluded that, if Berger had exercised due diligence and communicated the material settlement information to Stone, then the matter would have been brought to Stone's attention six days before the check was received, i.e., "within a reasonable time before collection of the instrument was initiated." *Id.* § 3.311(d).

Either way, Berger's settlement letter satisfied the due diligence provision in Subsection (d). *Id.* §§ 1.202(f), 3.311(d).

### 2. Forest Park Letter

But Berger's settlement letter did not stand alone. There was also evidence that the Forest Park office's "regular duties" included communicating correspondence to Stone, and that had they done so, Stone would have known of the settlement proposal before Low-T's check was cashed. *See id.* § 1.202(f).

Berger described the Forest Park address as a "regional mail office[]" responsible for "intaking mail" and "rout[ing] [it] to the appropriate location." And although United insists that the Forest Park address was only intended for appeal-

23

related documentation and "was not a proper address to use to communicate with Stone," the record supports a finding that United directed Low-T to send correspondence to the Forest Park address—both before and after its review of Low-T's appeal documentation had concluded—in a manner that implicitly associated that address with Stone.

In United's initial letter notifying Low-T of its overpayment determination, it identified Stone as the "investigator," and just a few lines later, the letter told Low-T that it could dispute the overpayment claim by mailing documentation to "United Payment Integrity[,] Attn: Recovery Investigations" using the Forest Park address. Logic dictates that "Investigations" likely involve "investigators" such as the one United had identified: Stone.

Then, several of Stone's follow-up letters to Low-T indicated that she worked in the "United Payment Integrity" division—seemingly the same division as that referenced in the Forest Park address.[22] And Stone herself repeatedly told Low-T to send mailings to the Forest Park address. After doing so in one letter—instructing Low-T to submit "appeal documentation . . . to the [Forest Park] United Payment Integrity address"—Stone stated, "[w]e look forward to receipt of [your] appeal documentation," implying by the royal "we" that she would be among those who

---

[22]We note, however, that there were two different addresses attributed to "United Payment Integrity" in United's letters or on its letterhead: the Forest Park address and the Atlanta P.O. Box address.

would receive the documents sent to the Forest Park address. She later indicated that she was, as she told Low-T that "[w]e reviewed the documentation submitted" and that the overpayment amount had been adjusted.

Stone used the Forest Park address again in May 2018, even though United had already concluded its review of Low-T's appeal documentation. When Stone could not open an encrypted email from Moraine, she asked him to "provide [his] communication via letter to the Forest Park address," implying that she could receive communications at that address as an alternative to email.

Plus, both Stone and Berger confirmed that, prior to the settlement offer, the letters Low-T had mailed to the Forest Park address were ultimately received by Stone.

Based on this evidence, the trial court could have concluded that the Forest Park "regional mail office[]"—a mail office responsible for "intaking" mail, an office that had successfully routed Low-T's letters to Stone in the past, and an address that Stone had repeatedly told Low-T to use for claim-related correspondence—had been held out by United as a mailing address for Stone and could have been expected to communicate correspondence to Stone as part of its "regular [job] duties." *Id.*; *cf. Bank of Salt Lake v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 534 P.2d 887, 890–91 (Utah 1975) (holding that church did not have notice under due diligence definition in Utah's codified UCC where clerical church employee received actual

25

notice but had no duty to communicate information and no knowledge of the underlying transaction).

It is undisputed that the Forest Park regional mail office received Low T's settlement letter on September 5. It is undisputed that this letter was addressed to Stone specifically. *Cf. Old Kent Bank-Se. v. City of Detroit*, 444 N.W.2d 162, 166 (Mich. Ct. App. 1989) (applying Michigan UCC's due diligence definition and rejecting city's argument that it had no notice where city claimed letter was sent to wrong office but certified letter was "directed to the Treasurer's Department" and it was reasonable to assume that "the city's agent would send it to the Treasurer's Department" when it arrived at the city office); *F.D.I.C. v. Heaton*, No. 2:13-CV-219 TS, 2014 WL 2777601, at *6 (D. Utah June 19, 2014) (mem. op. and order) (holding Utah UCC's version of Subsection (d) inapplicable when debtor did not address his settlement offer to his point of contact but instead mailed his offer to a department that gathered and scanned debtors' financial information). And it is undisputed that, when the settlement check was cashed six days later, the Forest Park office still had not transmitted the settlement letter to Stone or notified her of its existence. Whatever procedures were or were not in place at Forest Park, the evidence supports the trial court's finding that the Forest Park office—which, again, had been held out by United as having the responsibility to communicate information to Stone—inexplicably failed to communicate the settlement letter within six days of the letter's receipt.

This unexplained delay is even more striking in light of the procedures in place to quickly convey information received at another United address: the Hapeville lockbox. Berger testified that the "Wells Fargo staff will sweep the lockbox on a daily basis," they "image any . . . checks and any documentation associated with the check," and then they "enter [the images] into [United's] document tracking systems." The lockbox personnel were able to communicate the scanned check and documentation to the relevant United representative "the next day." The lockbox procedures thus demonstrate United's ability to quickly communicate information within the organization[23] and United's maintenance of a "document tracking system[]." If a lockbox dedicated to cashing checks—not "rout[ing]" mail—could log mailings into United's document tracking system and communicate those mailings to the appropriate United representative the next day, then absent evidence to the contrary, a United mailing center repeatedly referenced by Stone and dedicated to the task of "intaking" and "rout[ing]" mail could have been reasonably expected to communicate certified mailings within six days of receiving them. The Forest Park mail center's unexplained six-day delay supports an inference that Stone "would have [had the settlement letter] brought to [her] attention if the organization had exercised due diligence." Tex. Bus. & Com. Code Ann. § 1.202(f).

---

[23]Indeed, it demonstrates United's ability to quickly communicate information even when that information is coming from a contractor such as Wells Fargo.

In sum, the trial court was not manifestly unjust in concluding that, had United exercised due diligence, Low-T's tendering of its check in full satisfaction of United's claim would have been brought to the attention of the individual (or individuals) conducting and directly responsible for the transaction multiple days before the check was received or cashed. *See id.* §§ 1.202(f), 3.311(d). We overrule United's challenge to the due diligence override.[24]

And this issue is dispositive; because the due diligence override applies, the Subsection (c) exceptions are unavailable as a matter of law. *Id.* § 3.311(c), (d), cmt. 7 ("Subsection (c) is subject to subsection (d).").

## IV. Conclusion

Having overruled United's dispositive issue, we affirm the trial court's judgment. Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: January 5, 2023

---

[24]United also argues that the trial court's judgment will have a "chilling effect on large corporations that process thousands of checks a day." It is unclear if United intends to raise this as a separate appellate issue. Regardless, our role is to interpret and apply the law—not to rewrite it or to second-guess the legislature's balance of competing policies. *See Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 133 (Tex. 2019) ("It is not the Court's task to choose between competing policies addressed by legislative drafting. We apply the mandates in the statute as written." (quoting *In re Tex. Dep't of Fam. & Protective Servs.*, 210 S.W.3d 609, 614 (Tex. 2006) (op. on reh'g) (internal citations omitted))).